The **GREAT WESTERN SUGAR COM-PANY**, a Delaware corporation, Plaintiff-Appellant,

v.

**WHITE STOKES CO.**, an Illinois corporation, Defendant-Appellee.

Nos. 83–1668, 83–2401.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 23, 1984.

Decided June 13, 1984.

Victor F. Boog, Bradley, Campbell & Carney, Golden, Colo., for plaintiff-appellant.

John R. Myers, Bell, Boyd & Lloyd, Chicago, Ill., for defendant-appellee.

Before PELL and FLAUM, Circuit Judges, and HENLEY, Senior Circuit Judge.*

HENLEY, Senior Circuit Judge.

The Great Western Sugar Company brought this diversity suit alleging that White Stokes Co. breached an oral contract to purchase sugar. The district court granted White Stokes' motion for summary judgment and also awarded their attorneys' fees in defending the suit pursuant to the Illinois fee-shifting statute, Ill.Rev.Stat. ch. 110, § 2–611. On appeal Great Western contends that the question whether a prior oral contract had been entered involved a disputed issue of material fact precluding summary judgment. Great Western also contends that the district court abused its discretion in awarding White Stokes' attorneys' fees. We affirm in part and reverse in part.

Great Western alleged that White Stokes, through its president, Andrew Tzakis, placed an order for 30,000 hundredweight of sugar with Great Western's Chicago broker, John Offord,[1] on October 30, 1980. Tzakis, on the other hand, stated on deposition that he told Offord only that he would consider such an order and that no order was ever placed. Thereafter Offord sent a teletype "confirmation" to White Stokes to which White Stokes did not respond. On November 6, 1980, seven days after the alleged oral contract was entered, Great Western sent White Stokes a written "contract" letter.[2] This letter which was signed by Great Western's Vice President of Industrial Sales included the following language:

This letter is a written confirmation of our agreement, and *unless it is signed by the Buyer and returned to Great Western within 15 days from the date hereof, the agreement shall be deemed breached by Buyer and automatically terminated.*

Please sign and return to me the enclosed counterpart of this letter *signalling your acceptance of the above agreement.*

(emphasis added). It is undisputed that White Stokes never signed or returned the letter.

The practice of sending out such letters to Great Western's customers was initiated pursuant to a change in company policy in the late summer of 1980. Great Western's previous policy had been to sell beet sugar by means of renegotiable informal agreements without written confirmations or signed contracts. This change was considered "drastic" by Great Western personnel.

The district court acknowledged that there was some dispute whether an oral contract had actually been entered by the parties on October 30, 1980 and whether the alleged contract was enforceable under the statute of frauds. The court concluded, however, that these issues were rendered immaterial by the November 6 letter. The court held that the letter's language made it clear that White Stokes was under no contractual obligation unless it signed and returned the letter. The court based this interpretation on the plain and unambiguous language of the letter itself. In the alternative, the court held that, even if the letter's wording was found to be am-

---

* The Honorable J. Smith Henley, Senior Circuit Judge of the United States Court of Appeals, Eighth Circuit, is sitting by designation.

1. It appears that Offord dealt only with Great Western's New York broker, B.W. Dyer & Co., on an independent contractor basis. Thus White Stokes contends that Offord had no authority to bind Great Western to the alleged oral contract by sending the October 30 confirmation. Great Western asserts Offord did have such authority, however, since Offord issued the confirmation only after receiving permission to accept the order from Great Western. The district court never explicitly decided this issue. For the purpose of this appeal, we will assume Offord had authority to bind Great Western even though the issue's resolution may not be necessary in view of the result we ultimately reach.

2. Many customers who received such letters failed to sign and return them. Great Western has sued more than one hundred companies on the basis of these contract letters.

biguous and required resort to extrinsic evidence, an identical interpretation was mandated by the admissions of Great Western's own officers as to the intended meaning of the letter.

■ The existence *vel non* of a prior oral contract is a disputed issue given the inconsistent deposition testimony of Offord and Tzakis. Nevertheless, we agree with the district court that the November 6 letter rendered that issue immaterial. We do not agree, however, that this result is mandated by the unambiguous language of the letter itself. Part of the letter's wording seems to assume the existence of a prior oral agreement ("the agreement shall be deemed breached ... and automatically terminated") while the very next sentence suggests that the letter was an offer as yet unaccepted ("Please sign and return ... signalling your acceptance of the above agreement"). Therefore we must look to extrinsic evidence in order to determine the parties' intentions as to the letter's meaning.[3]

White Stokes presented the only evidence as to this intent. The deposition testimony of C.H. Criswell and Donald Berra, both officers of Great Western at the time the letter's language was drafted, indicated that, unless the customer signed and returned the letter, Great Western would not consider either party to be bound to any agreement.[4] Great Western contends that, notwithstanding this deposition testimony, the issue of whether an oral contract was in existence at the time of the sending of the November 6 letter is nonetheless material. It asserts that the letter expressly provides that the refusal of the buyer to sign and return the letter constitutes a breach of the agreement. Great Western's theory is that while it terminated the agreement when White Stokes did not sign and return the letter, as cancelling party it retains any remedy for the contract's breach pursuant to Ill.Rev.Stat. ch. 26, § 2–106(3), (4).

Whether execution of the letter was a condition precedent to the formation of a contract or whether the letter instead gave Great Western a right to terminate any pre-existing contractual relationship upon a buyer's refusal to confirm the oral agreement was an issue left unresolved by the district court. The court stated that it was not "truly important whether we characterize a buyer's signature on this letter as a condition precedent to formation of a contract or whether we view a buyer's refusal to sign as a rightful cancellation of a contract already formed." However, if the letter did act to terminate or cancel a contract already formed, and if Great Western can be characterized as the cancelling par-

3. It is by now axiomatic that a court may consider extrinsic evidence in determining the intent of the parties where the writing is ambiguous. *See* 3 A. Corbin, *Corbin on Contracts* § 579 (1960); 4 S. Williston, *Williston on Contracts* § 610B (3d ed. 1961).

4. The following is an excerpt from one of Criswell's depositions:

Q. But under the contract that you had set up, it was your intention that the customer had the option of not signing it and not taking the business; is that correct?

A. If they didn't sign it, then we would get ahold of them. And then at that time if they didn't take it or weren't going to sign the contract, I would say, "All right, we are off the hook. I will sell that sugar in a different direction."

Q. In other words, the deal was off?

A. That's right.

Q. And both parties were free to go their way?

A. That's right.

Q. Did you explain your intentions with regard to this procedure we have been discussing to Mr. Sheehy [the Great Western employee who succeeded Criswell in late October 1980]?

A. That's correct.

· · · · ·

Q. And you explained to Mr. Sheehy that if the customer did not want to sign it, then there would be no contract?

A. Then we were no longer obligated to hold the sugar for him.

Q. And the customer was no longer obligated to take it?

A. That's right.

Criswell deposition at 17–18. Berra stated that the language meant that "unless the customer returned a signed confirmation to Great Western Sugar, then Great Western Sugar would not consider it to be a contract." Berra deposition at 46–47.

ty, it may indeed be said to retain its remedies for breach pursuant to § 2–106.

The clumsy language of "breach" and "termination" reasonably could have been intended to mean that a failure to confirm the oral agreement terminates all executory obligations of contract, but still constitutes a breach of the agreement, entitling Great Western to recover the profits it may have lost as a result of the failure to confirm.

*Great Western Sugar Co. v. Gehl Guernsey Farms, Inc.*, No. 82–C–0433, slip op. at 3 (E.D.Wis. Jan. 21, 1983). If this interpretation is correct, then the existence *vel non* of a prior oral contract would be a material issue in the dispute.

■ While Great Western's interpretation is plausible, the deposition testimony is inconsistent with this theory. Nowhere in this testimony can we find any statements indicating Great Western's belief that it would have any cause of action against a buyer if it did not sign and return the letter or that such a buyer's refusal would be considered a breach of contract. The substance of the testimony is that, absent the buyer's signature, either party could walk away from the transaction without recourse. Therefore we can only conclude that the signing and return of the letter by the buyer was either a condition precedent to the formation of a binding contract between the parties or that the letter gave the *buyer* an option to terminate any contract previously entered.[5] Other courts confronting the same letter in analogous fact patterns have reached similar results with regard to the letter's effect even though the rationales of these decisions differ slightly. *See Great Western Sugar Co. v. Lone Star Donut Co.*, 721 F.2d 510

(5th Cir.1983); *Great Western Sugar Co. v. Seven-Up Fort Worth Bottling Co.*, No. CA–3–82–0240–D (N.D.Tex. Dec. 3, 1982); *Great Western Sugar Co. v. Oklahoma Beverage Co.*, No. Civ.-82–190–W (W.D. Okla. Nov. 23, 1982); *Great Western Sugar Co. v. Lake County Beverages, Inc.*, No. 82–C–180–C (N.D.Okla. Oct. 18, 1982); *Great Western Sugar Co. v. Enzo Gel Co.*, No. 81–C–766 (E.D.Wis. March 23, 1982). *Contra Great Western Sugar Co. v. Gehl Guernsey Farms, Inc.*, No. 82–C–0433 (E.D.Wis. Jan. 21, 1983) (issue of whether prior oral contract was entered precludes summary judgment). The *Gehl Guernsey* case is distinguishable since, as the district court here noted, the court there did not have the benefit of the basically uncontradicted deposition testimony of Great Western's officers as to the intended meaning of the letter. Since Great Western presented no evidence which conflicted with this interpretation, no material issue of fact remained and summary judgment was therefore appropriate.

■ The district court, relying upon Ill.Rev.Stat. ch. 110, § 2–611,[6] granted White Stokes' motion for attorneys' fees and costs in the full amount requested, $92,043.51 plus interest. In order to be eligible for an award of fees under the statute, White Stokes must prove that Great Western's allegations were untrue and made without reasonable cause. *McCormick v. Louis Joliet Bank & Trust Co.*, 114 Ill.App.3d 205, 209, 70 Ill.Dec. 27, 29–30, 448 N.E.2d 905, 907–08 (1983). The district court found both elements to be met here. We must uphold the district court's determination absent an abuse of

---

**5.** This conclusion also answers Great Western's contention that Offord's teletype confirmation of October 30 was sufficient to make the oral contract enforceable under the statute of frauds. Great Western's reliance on the October 30 confirmation is misplaced. Even assuming that the statute of frauds is not a bar to the enforceability of the alleged prior oral contract, we conclude that no binding contract existed since White Stokes did not sign and return the November 6 letter.

**6.** Section 2–611 provides in part:

Allegations and denials, made without reasonable cause and found to be untrue, shall subject the party pleading them to the payment of reasonable expenses, actually incurred by the other party by reason of the untrue pleading, together with a reasonable attorney's fee, to be summarily taxed by the court upon motion made within 30 days of the judgment or dismissal.

discretion. *Id.* at 210, 70 Ill.Dec. at 30, 448 N.E.2d at 908.

▆▆▆ The purpose of the statute is "to penalize the litigant who pleads frivolous or false matters or brings a suit without any basis in law and thereby puts the burden upon his opponent to expend money for an attorney to make a defense against an untenable suit." *Ready v. Ready,* 33 Ill. App.2d 145, 161, 178 N.E.2d 650, 658 (1961). The statute is clearly penal in nature and thus it can be invoked only in cases falling strictly within its terms. *See, e.g., Third Establishment, Inc. v. 1931 North Park Apartments,* 93 Ill.App.3d 234, 243, 48 Ill.Dec. 765, 772, 417 N.E.2d 167, 174 (1981); *Grover v. Commonwealth Plaza Condominium Assoc.,* 76 Ill.App.3d 500, 512, 31 Ill.Dec. 896, 905, 394 N.E.2d 1273, 1282 (1979).

> In light of the general public policy favoring access to the courts …, it seems clear that section 41 [currently section 2–611] should not be construed to permit the awarding of attorney's fees whenever a motion for summary judgment or for judgment on the pleadings is granted. Rather it appears that the application of section 41 should be limited to cases where a party has abused this right of free access to the courts by pleading untrue statements of fact which the party knew or reasonably should have known were untrue.

*Third Establishment,* 48 Ill.Dec. at 773, 417 N.E.2d at 175. In addition, it is assumed that the attorneys who filed the pleadings "have due regard for their duties …, and they are permitted to exercise broad discretion based upon an honest judgment from the facts presented to them." *Williams v. City of Chicago,* 54 Ill.App.3d 974, 979, 12 Ill.Dec. 496, 500, 370 N.E.2d 119, 123 (1977).

▆▆▆ After reviewing the relevant pleadings and keeping firmly in mind the statute's purpose, we conclude that the district court should not have awarded fees against Great Western. We simply cannot agree that Great Western's suit was frivolous, untenable, or was brought without any basis in law. Great Western's complaint was based upon the alleged oral contract entered October 30, 1980. Offord's deposition testimony provides a reasonable basis for this assertion. In point of fact, this precise issue was never resolved in the district court since the court based its decision entirely on the November 6 letter. Thus, none of the factual assertions made by Great Western has been proven to be untrue. As for the letter itself, its legal effect was not so clear as to make Great Western's suit unreasonable since, as we have already stated, the letter's precise wording made its meaning ambiguous. Although we have upheld the district court's conclusions as to the letter's legal effect on the transaction, the result was not a foregone conclusion.

The district court placed great emphasis on the deposition testimony of Great Western's officers in reaching its decision. However, we are not so swayed by this testimony that we can conclude that Great Western's suit "was without any basis in law." These officers were not testifying in terms of this specific litigation but only in reference to their own general interpretation of the letter at the time it was drafted. Even though such testimony certainly has relevance to the parties' intentions as to whether a contract had been formed, the legal conclusions or opinions of such laymen as to the legal significance of the language contained in the November 6 letter do not necessarily make false or unreasonable Great Western's pleading that an oral contract existed and that it was breached. We believe that Great Western had the right to advance its theory as to the letter's effect. Even though we ultimately rejected it, we have already stated that this interpretation was at least plausible. In short, we cannot say that Great Western's construction of the letter's effect was so untenable or frivolous as to justify an award of fees under this particular statute.

We affirm summary judgment in favor of White Stokes but reverse that portion of

the district court's decision awarding attorneys' fees.[7]

---

**7.** We do not reach Great Western's contention that a hearing is required under the statute and that the award is invalid because the district court did not provide such a hearing. Similarly, we do not reach its contention that the amount of fees awarded is excessive.